IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03513-CMA-NRN

JENNIFER LARKIN,

Plaintiff,

v.

A-B PETROLEUM INC,
BRIAN HALDORSON,
JANET CUNNINGHAM,
GREG WAKEMAN, and
BARBARA DICKSON,

Defendants.

---

**REPORT AND RECOMMENDATION ON
DEFENDANTS A-B PETROLEUM, INC., BRIAN HALDORSON, JANET
CUNNINGHAM, AND GREG WAKEMAN'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT
(Dkt. #16)**

---

**N. REID NEUREITER
United States Magistrate Judge**

This matter is before the Court pursuant to an Order (Dkt. #31) issued by Judge Christine M. Arguello referring Defendants A-B Petroleum, Inc., Brian Haldorson, Janet Cunningham, and Greg Wakeman's (collectively, "Defendants") Motion to Dismiss Plaintiff's Complaint (Dkt. #16). Plaintiff Jennifer Larkin filed a response (Dkt. #27), and Defendants filed a reply (Dkt. #28). On August 26, 2021, the Court held an evidentiary hearing on the subject motion. (*See* Dkt. #41.) The Court has taken judicial notice of the Court's file and considered the applicable Federal Rules of Civil Procedure and case

law. Now, being fully informed and for the reasons discussed below, it is **RECOMMENDED** that the subject motion be **GRANTED**.

## BACKGROUND

### I. Plaintiff's Complaint

The allegations in the Complaint are as follows: Plaintiff is an individual with disabilities and uses a certified service dog named Echo. On August 12, 2019, Plaintiff and Echo entered the A-B Petroleum gas station to purchase a bag of sunflower seeds. Defendant Cunningham, a store employee, "shouted" at Plaintiff to inquire whether Echo is a service dog, to which Plaintiff responded affirmatively. Cunningham accused the dog of "not working" or "not performing a duty" and instructed Plaintiff to leave the store immediately. Plaintiff tried to explain to Cunningham that the dog was allowed to be in the store and that she was not required to show her any paperwork proving that Echo was a service animal. Cunningham "forcibly lunged" at Plaintiff and again demanded she leave. Plaintiff started to have a panic attack. Cunningham told Plaintiff she was going to call the police.

Plaintiff sought help from Defendant Wakeman, who she thought was a store manager. Wakeman also told Plaintiff she needed documentation proving Echo was a service animal, and casually dismissed Plaintiff's protests to the contrary.

Cunningham, meanwhile, had called the police, allegedly falsely telling them Plaintiff was crazy and violent. Defendant Dickson, a cashier, proceeded to taunt Plaintiff. Defendants' actions caused Plaintiff to collapse outside the store and sob and shake. Police officers eventually arrived and issued Plaintiff a Trespass Order barring

2

Plaintiff from the property for one year. Unable to safely drive, Plaintiff was dropped off at the Jefferson Center for Mental Health.

Plaintiff filed a Complaint for Discrimination with the Colorado Civil Rights Commission ("CCRC") on October 14, 2019. A-B Petroleum's President, Defendant Haldorson, filed a response purporting to show that the company supported and had respect for people with disabilities and their service animals.

Plaintiff asserts three claims for relief: (1) violations of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 ("ADA"); violations of the Colorado Anti-Discrimination Act, Colo. Rev. Stat. §§ 24-34-601, 24-34-306(2)(b)(I)(B), 24-34-301(5)(a) and (5.3), 24-34-505.6, 24-34-801, ("CADA"); and (3) outrageous conduct (intentional infliction of emotional distress).

## II. Defendants' Motion to Dismiss

Defendants argue that Plaintiff's ADA claim should be dismissed as moot under Rule 12(b)(1) because A-B Petroleum has voluntarily remedied the violation, has established an ongoing training requirement, and future violations are not reasonably expected to occur. Defendants also ask that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## LEGAL STANDARD

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case, but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise

3

jurisdiction when specifically authorized to do so). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *See id.* at 909. Accordingly, Plaintiff in this case bears the burden of establishing that this Court has jurisdiction to hear her claims.

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.
>
> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1002–03 (citations omitted).

The subject motion purports to launch a factual attack on the Court's subject matter jurisdiction; normally, such an attack prevents the Court from accepting the truth of the Complaint's factual allegations for its Rule 12(b)(1) analysis. The Court generally may consider other documents to resolve disputed jurisdictional facts, and on August 26, 2021, the Court held an evidentiary hearing to resolve the jurisdictional dispute. (*See* Dkt. #44.)

At that hearing, Brian Haldorson and two of A-B Petroleum's supervisors, Austin Haldorson and Greg Wakeman testified. Documents, including A-B Petroleum's revised written service animal policy, were entered into evidence.

## ANALYSIS

### I. Mootness Doctrine

Defendants factually attack Plaintiff's ADA claim on the grounds of mootness, arguing that by voluntarily remediating the alleged offending policy of excluding service animals, Plaintiff's claim is made moot.

The doctrine of mootness is grounded in Article III's limitation on the jurisdiction of federal courts to "cases and controversies." *Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015). Mootness "is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996). The law is clear that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016). "Mootness deprives federal courts of jurisdiction." *United States v. Zamora*, 2019 WL 5214000, *2 (10th Cir. Oct. 15, 2019) (citing *Schnell v. OXY USA Inc.*, 814 F.3d 1107, 1114 (10th Cir. 2016) ("If a case becomes moot, we have no subject-matter jurisdiction.")).

A suit "becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome[,]" *Chafin v. Chafin*, 568 US. 165, 172 (2017), or "if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Brown*, 822 F.3d at 1165 (quoting *Already,*

5

*LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). The central question "is whether granting a present determination of the issues offered will have some effect in the real world." *Id.* at 1165–66. "Put another way, a case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." *Id.* at 1165 (quoting *Ind*, 801 F.3d at 1213).

As the Tenth Circuit has explained, there are two exceptions to the mootness doctrine—that is, "situations in which a case remains subject to federal court jurisdiction notwithstanding the seeming extinguishment of any live case or controversy." *Brown*, 822 F.3d at 1166. The relevant exception in this case concerns "voluntary cessation" of the defendant's conduct. Under this exception, "voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012). The rule is designed to prevent gamesmanship. *Brown*, 822 F.3d at 1166. If voluntary cessation automatically mooted a case, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Id.* (citation omitted).

A defendant's voluntary cessation may moot a case if the defendant carries "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (citation omitted). Voluntary actions will moot litigation upon satisfaction of two conditions "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged

6

violation." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1115 (10th Cir. 2010) (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). The Supreme Court has described this burden as "heavy," *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007), and "stringent," *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000). "The party asserting mootness bears the heavy burden of persua[ding] a court that the challenged conduct cannot reasonably be expected to start up again." *Rio Grande Silvery Minnow*, 601F.3d at 1115; *see also Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) ("Such a burden will typically be met only by changes that are permanent in nature and that foreclose a reasonable chance of recurrence of the challenged conduct."). However, the defendant "does not need to show that there is 'no possibility' of recurrence—only that its challenged actions could not reasonably be expected to recur." *Prison Legal News v. Fed. Bureau of Prisons*, 944 F.3d 868, 884 (10th Cir. 2019). In mootness cases, whether the wrongful conduct can "reasonably be expected to recur" is "squarely a legal determination." *Brown*, 822 F.3d at 1168 (quoting *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1188 n.15 (11th Cir. 2007)).

## II. Defendants' Remediation Evidence

      A-B Petroleum is a small, family-owned company of Sinclair-branded gas stations with approximately 65 employees in 10 locations in the Denver metro area and one in Breckenridge.

      Defendants argue that in November 2019, after being informed of a potential violation of Colorado's public accommodations statute, A-B Petroleum took the following

steps to ensure future customers utilizing a service animal have a positive experience at its stores:

> On November 11, 2019 – four days before responding to Plaintiff's Complaint with the Division – A-B Petroleum's operations manager Austin Haldorson met with all company managers. *See* Affidavit of B. Haldorson, attached as Exhibit E at ¶ 3. During that meeting, he provided a copy of relevant sections from both the Colorado Revised Statutes and Colorado's Department of Regulatory Agencies guidance materials concerning interactions with individuals with service animals. *Id.* The purpose of providing such information was to ensure both compliance with all applicable Federal and state regulations, and positive customer experiences while in A-B Petroleum's stores. *Id.* at ¶ 4. During this meeting, Austin Haldorson directed the company managers to post the written materials provided at time clocks located in all A-B Petroleum stores. *Id.* at ¶ 5. The purpose of posting this material was to ensure that employees were aware of the material. *Id.* at ¶ 6. A-B Petroleum immediately began training all new and existing employees on the legal requirements concerning service animals, and communicated the company's expectations to all employees through its managers that employees comply with the requirements. *Id.* at ¶ 7.
>
> The following April, A-B Petroleum adopted a more formal written policy specific to interactions with disabled customers and their service animals. *See* A-B Petroleum Policy Section 15.5 "Service Animals," included as Exhibit 1 to Motion to Dismiss Ex. A (the "Policy"). Like the earlier posting of state law and regulations, the goal in creating the Policy was to ensure both compliance with all applicable Federal and state regulations, and positive customer experiences while in A-B Petroleum's stores. Ex. E at ¶ 9. The Policy was reduced to writing, incorporated into A-B Petroleum's employee handbook, and circulated to all employees that same day. *Id.* at ¶ 10. The Policy makes clear that A-B Petroleum employees may not ask any additional questions concerning the animal. *Id.* at ¶ 12. Like the earlier posting of state law and regulation, the Policy is available for employees to access in all of A-B Petroleum's stores. *Id.* at ¶ 13.
>
> The Policy made specific reference to ADA requirements for service animals, and notified employees of the limitations on questions that could be asked of customers ((1) "Is this a service animal?" and (2) "What task has the animal been trained to perform?") Ex. 11. It was A-B Petroleum's intent that the policy would be a permanent addition to its corporate policies and procedures – which it has been since its adoption. *Id.* at ¶ 14. A-B Petroleum has no plans to eliminate the policy. *Id.* at ¶ 15. It has trained all existing employees on the policy, and will train all future employees to comply. *Id.* at ¶ 16.

8

(Dkt. #16 at 5–6.)

At the August 26, 2021 evidentiary hearing, witnesses were Brian Haldorson, President of A-B Petroleum, and his son, Austin Haldorson, who, along with Defendant Wakemen, is one of two A-B Petroleum supervisors.[1] The testimony was both credible and consistent with the facts as set forth in Defendants' motion.

Specifically, Brian Haldorson testified that A-B Petroleum has had a policy manual for about 35 years that gets updated periodically. When company policies change, the manual gets revised, and the two supervisors talk to each manager at the 11 gas stations owned by A-B Petroleum. The managers, in turn, are directed to talk to and instruct the stores' employees on the policy change.

Brian Haldorson heard from Defendant Wakeman about the incident involving Plaintiff within a day of it happening. Mr. Brian Haldorson did not think Defendants had done anything wrong and did not take any steps regarding A-B Petroleum's service animal policy, nor did he look into whether A-B Petroleum was complying with state and federal laws. Brian Haldorson explained that his inaction was because police had arrived, talked to the people involved, and issued Plaintiff a Trespass Notice. None of the Defendants were arrested or cited for anything. Brian Haldorson also testified that the company's policy was to allow service animals, but not pets or emotional support animals, into its stores. His understanding at that time was that the difference between a service animal and a pet or emotional support animal was that a service animal was identifiable as such and performed an identifiable task. In short, prior to contact from the

---

[1] Mr. Wakeman also briefly testified after being called by Plaintiff's counsel. His testimony is not especially germane to the jurisdictional issue before the Court.

CCRC, Mr. Haldorson believed his employees' actions were consistent with both with A-B Petroleum's policy and the law.

In early November 2019, Defendants were served with a notice from the CCRC about the incident with Plaintiff. Brian Haldorson testified that in response to notice, he soon thereafter searched the state's website and found the Public Accommodation Notice approved by the Colorado Department of Regulatory Agencies ("DORA"). After doing this research, Brian Haldorson understood that his prior perceptions on what was required to comply with state and federal public accommodation regulations regarding service animals were not accurate. Under the law, service animals are limited to a dog or miniature horse, and customers can only be asked two questions: (1) Is this a service animal trained to perform a task or work related to a disability? and (2) What is the task or work the animal is trained to perform. The customer does not need to produce any documentation (like a license) certifying that the animal is a service animal. Mr. Haldorson realized there needed to be a change in A-B Petroleum's service animal policy.

Brian Haldorson testified that he convened a mandatory manager meeting on November 11, 2019 to discuss, among other things, A-B Petroleum's new animal policy, which was to be consistent with the DORA Public Accommodation Notice.[2] A written agenda from that date confirms that the "Animals" policy was to be discussed. (*See* Def.'s Hr'g Ex. A.) At that meeting, Brian Haldorson had a copy of the Public Accommodation Notice and walked through the document with the managers. He

---

[2] The manager of the Breckinridge store was not present, but Austin Haldorson testified he explained the new policy to this manager in person soon thereafter.

10

testified that managers were instructed to go back to stores to discuss the notice with all employees; managers had no discretion on whether to do so if they wanted to keep their jobs. Managers were also told to post the Public Accommodation Notice by the time-clock area of each store so employees would see it at least twice per shift.

Although the new service animal policy took effect immediately, A-B Petroleum's written policy manual was not revised until April 2020. Brian Haldorson explained that the person who was responsible for the manual was too busy to update it in the intervening months, but that all current employees had the policy explained by the managers and it was included in the training for new employees. Thus, all employees in A-B Petroleum stores have been trained on the law regarding service animals, as will all future employees.

The new written policy lists the two questions a business is legally allowed to ask regarding a service animal and states, "Company employees will not be permitted to ask any other questions about the animal. If the employee is unsure about the status of the service animal they [sic] should provide quick and friendly service to the customer so that the animal can exit the store as quickly as possible." (*See* Def.'s Hr'g Ex. D at 60.) Plaintiff's counsel acknowledged during argument that this written policy complies with federal and state law regarding service animals.

Brian Haldorson credibly testified that the policy has been in effect since November 2019, and will remain in place "in perpetuity," unless the law changes. He explained that A-B Petroleum has nothing to gain by removing it or not abiding with the law.

11

Austin Haldorson also testified. As a supervisor, he was responsible for six A-B Petroleum locations. He was present at the November 11, 2019 meeting. He testified that within one month of the meeting, the Public Accommodation Notice had been posted at all locations. The notice was to stay up for at least two weeks, but managers could then take the notice down after talking to their employees.

Austin Haldorson also is involved in training new employees. He testified that A-B Petroleum utilized a PowerPoint presentation, titled "New Employee Training & Policy Overview" for new employee orientation. (*See* Def.'s Hr'g Ex. C.) One slide of this PowerPoint presentation addresses visitors in the store and covers the service dog policy. (*Id.* at 101.) That slide states that "only service dogs will be permitted inside any food store (Public Accommodation C.R.S. 24-34-803)". Austin Haldorson credibly testified that during the orientation, he has with him a physical copy of the Public Accommodation Notice that he goes over with the new employee. New employees are also expected to take and pass a test on A-B Petroleum's policy manual, although the test does not have a question about service animals. Austin Haldorson testified that he does not train employees on the difference between service dogs and emotional support dogs because employees are instructed to only ask whether the dog is a service dog. If the customer says it is, that effectively ends the discussion and, consistent with A-B Petroleum's written policy, the employee is to provide "quick and friendly service to the customer so that the animal can exit the store as quickly as possible."

The Court finds that all three witnesses who testified on behalf of A-B Petroleum were credible. The Court finds that soon after being informed by the CCRC of a possible

violation of the law regarding the treatment of a disabled person using a service dog, Brian Haldorson educated himself about the deficiencies in the company's then-existing policy, implemented a new policy consistent with the law, insisted that all current employees be informed of the new policy, and further insisted that all new employees be trained on the policy at the time of hiring. The Court finds that these instructions were followed, that the policy was implemented, and all existing and newly hired employees were instructed on A-B Petroleum's new policy which complies with both the ADA and Colorado law.

### III. Discussion

Plaintiff maintains that Defendants have not met their burden in showing that it is absolutely clear that their allegedly wrongful conduct will not occur again. Plaintiff argues that the Defendants' responses to the CCRC, which were made after the November 11, 2019 meeting, indicate that Defendants do not believe they did anything wrong and their discriminatory attitudes remain unchanged. She also asserts that the fact that A-B Petroleum does not keep the Public Accommodation Notice posted in a conspicuous place year-round and does not have a question about it on the new-hire exam evinces a lack of seriousness about this issue. The Court disagrees.

First, the written statements from Defendants Cunningham, Wakeman, and Dickson (Dkt. #16-1) merely recount their version of the events that happened on August 12, 2019, and reflect those employees' understanding of the company's policy at that time. Those events are of limited relevance here because the Court's inquiry focuses on *what happened next*. Indeed, Defendants now concede that the policy, as understood by employees in August 2019, did not accurately reflect the law. The

statements do not rebut the evidence that A-B Petroleum promptly changed its service animal policy after learning of its deficiencies.

Next, the Court is persuaded that the conduct described in Plaintiff's Complaint cannot reasonably be expected to recur. Brian and Austin Haldorson testified, under oath, that when they were presented with information indicating that A-B Petroleum and its employees were not complying with the law, they promptly changed their service animal policy, met with the management team to inform them of the policy change, posted the Public Accommodation in its stores where employees would see the notice, instructed managers to go over the changes with employees, and added the revised policy to the store's manual and training material that is presented to all new employees. The Court finds the Haldorsons' testimony credible and unrebutted. Plaintiff's counsel, in fact, agreed that A-B Petroleum's service animal policy, as reflected in its manual and in effect since April 2020, is compliant with the law.

Thus, the evidence shows that A-B Petroleum has a service animal policy in place that complies with state and federal law. The evidence further shows that A-B Petroleum has and will continue to train its employees on this policy. There is no evidence that indicates this policy is pretextual or unenforced; Brian Haldorson testified that there have not been any incidents or complaints related to the service animal policy since it has been implemented. There is also no evidence or any reason to believe that the policy will be substantively changed or revoked. The Court credits Brian Haldorson's testimony that A-B Petroleum has every incentive to ensure that each customer's experience in one of its stores is a positive one, and there is no incentive to unnecessarily confront or harass a disabled customer accompanied by a service

14

animal. In short, the Court finds the Defendants' remedial actions are genuine. The fact that Defendants theoretically could have taken some other measures—for example, they could, as Plaintiff points out, post Public Accommodation Notice year-round or put a question about the service animal policy on the new employee exam—does not alter the Court's findings that, through the actions they did take, it is absolutely clear that there is no reasonable expectation that the alleged violation will recur. Defendants have therefore satisfied their heavy burden to show that the voluntary cessation exception to mootness does not apply. *See Stan v. Wal-Mart Stores, Inc.*, 111 F. Supp. 2d 119, 127 (N.D.N.Y. 2000) ("Because Defendants here have the proper policies with respect to service animals and have counseled its employees with respect to such issues, it has carried out its obligations under Title III of the ADA.").

It is true that A-B Petroleum could have posted the Public Accommodation Notice permanently in all gas station offices. But the Court credits the explanation that A-B Petroleum's policy manual contains numerous policies addressing health, safety, and compliance with the law, some no less important than the service dog policy. These include policies on sexual harassment (Hr'g Ex. D at 6); use of controlled substances (*id.* at 7); weapons in the workplace (*id.* at 8); lawful alcohol sales (*id.* at 19); lawful tobacco sales (*id.* at 20); cash control (*id.* at 22); robbery deterrence (*id.* at 28); robbery procedure (*id.* at 29); food service sanitation (*id.* at 56); employee injuries (*id.* at 62); petroleum/chemical spills (*id.* at 65); and OSHA compliant hazard communications (*id.* at 87). If each of these important policies (and others) were posted in every office, then any particular message would get lost in the noise. The Court concludes that the presence of the policy manual in every office, which includes the legally compliant

15

service animal policy, coupled with specific training on the service animal policy for every new hire via discussion of the written Public Accommodation Notice, is adequate to ensure there will be no recurrence of the alleged harassment of a person accompanied by a service animal.

As explained in *Stan v. Wal-Mart Stores*, a very similar case where a disabled shopper improperly was challenged about the presence of a service animal in a Wal-Mart store, "under the ADA, [d]efendants can and must ensure that they adopt the proper policies and procedures to train their employees on dealing with disabled individuals and make reasonable efforts to ensure that those policies and procedures are properly carried out and enforced." *Stan*, 111 F. Supp. 2d at 127. In her Complaint, Plaintiff asks for injunctive relief "in the form of a Court order requiring Defendants to comply with the applicable rules and regulations . . . ." (Dkt. #1 at 27.) Defendants indisputably are doing so on their own. Therefore, there is no ongoing ADA injury that can be redressed by a favorable judicial decision and granting Plaintiff's requested relief would "have no effect in the real world." *Brown*, 822 F.3d at 1165. Plaintiff's ADA claim is moot and should be dismissed. *See Stan*, 111 F. Supp. 2d at 127.

In light of the recommended dismissal of the federal ADA claim, the Court should exercise its discretion under 28 U.S.C. § 1367(c)(3) and decline to exercise supplemental jurisdiction over Plaintiff's state law claims. *See Stout v. Seitz*, No. 17-cv-01904-CMA-STV, 2018 WL 2948222, at *5 (D. Colo. June 13, 2018) ("As a general rule, the balance of factors to be considered will point towards declining to exercise jurisdiction over state-law claims when the federal claims have been eliminated prior to trial.").

## **RECOMMENDATION**

For the foregoing reasons, it is hereby **RECOMMENDED** that Defendants A-B Petroleum, Inc., Brian Haldorson, Janet Cunningham, and Greg Wakeman's ("Defendants") Motion to Dismiss Plaintiff's Complaint (Dkt. #16) be **GRANTED** and Plaintiff's Complaint (Dkt. #1) **DISMISSED WITHOUT PREJUDICE**.

**NOTICE: Pursuant to 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case. A party may respond to another party's objections within fourteen (14) days after being served with a copy. The District Judge need not consider frivolous, conclusive, or general objections. A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge,** *Thomas v. Arn***, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.** *Makin v. Colo. Dep't of Corr.***, 183 F.3d 1205, 1210 (10th Cir. 1999);** *Talley v. Hesse,* **91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Dated:  August 27, 2021
        Denver, Colorado

        N. Reid. Neureiter
        United States Magistrate Judge